THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROGELIO AGUERO, Defendant-Appellant.

First District (1st Division)    No. 79-2069

Opinion filed August 4, 1980.

Julius Lucius Echeles and George M. Zuganelis, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Rogelio Aguero (defendant) was indicted for the murder of Anastacio Ruiz and Rogelio Noyola. The jury found defendant guilty of

voluntary manslaughter for the death of Ruiz and acquitted him on all other charges. Defendant was sentenced to five years. He appeals.

Noel Roldan testified he went to a tavern on August 12, 1977, between 8 and 8:30 p.m. There he met Jimmy Bryand, Hector Medina, Ricky Ochoa, Anastacio Ruiz, and Rogelio Noyola. The group left the tavern together. All six walked down the alley in groups of two. Roldan and Medina were in the first group, followed by Bryand and Noyola, and then by Ochoa and Ruiz. The groups were approximately 10 feet apart. Roldan testified he saw three girls, Stella, Adelle, and Virgie, walking one block ahead of them.

As Roldan reached the end of the alley, he heard his name called. He turned around and observed defendant "had" Ruiz "by the collar." Defendant was with a girl, Christina Jama. Roldan saw Noyola walk toward defendant. Noyola told defendant Ruiz was not bothering anyone and to leave him alone. Defendant then "pulled his hand" away from Ruiz. Roldan saw a gun in defendant's hand. Defendant put the gun against Roy Noyola's head. Noyola pulled the gun down. Defendant again put the gun to the left side of Noyola's head. Roldan heard a shot and saw Noyola fall to the ground.

Roldan then "saw the man coming toward" him and Medina. He turned around and started running. He ran across the street and behind a parked car. Roldan heard two more shots. He later walked back to the scene and saw defendant and Christina Jama walking down the alley about a block away. Noyola and Ruiz were lying in the alley.

On cross-examination Roldan testified he did not belong to the gang, the "Latin Kings." He said none of his friends present that night was a member. He also stated that when he turned around he saw Christina Jama had grabbed defendant's arm and cried, " 'Don't do it. Don't do it.' " He had never seen defendant before. He also said the lighting in the alley was "good."

Rick Ochoa corroborated Roldan's testimony concerning the death of Noyola with some variations. Ochoa also testified he saw defendant "grab" Ruiz from behind and push him against the wall. After defendant turned from Ruiz to Noyola, Ruiz "walked away." Defendant then "grabbed" Noyola "by the collar." After shooting Noyola, defendant "ran to Anastacio [Ruiz] and grabbed him in the back of the collar." Defendant put the gun to the back of Ruiz's head and fired. Ochoa ran toward the street. He heard another shot. A little later he turned around and saw defendant "standing there playing with the gun." On cross-examination Ochoa testified he did not belong to the Latin Kings. On redirect Ochoa testified one of the girls he observed one block ahead of them was Stella Jama (Christina's sister).

Bryand's testimony corroborated that of Roldan and Ochoa with

reference to both of the shootings. Bryand testified after Noyola had been shot he saw defendant "run up to Anastacio Ruiz" who was "fifteen feet away." Defendant "grabbed Ruiz by the back of the collar" and "fired another shot" into the back of his head. Bryand started running and soon heard another shot. He then looked for the police. On cross-examination Bryand testified he was not a member of the Latin Kings.

Hector Medina testified he saw defendant "holding" Ruiz. Defendant had Ruiz "against the wall." Noyola walked over to defendant. Defendant stated, " 'Don't mess with those girls.' " Defendant then released Ruiz and grabbed Noyola's right shoulder. Medina saw a gun in defendant's hand. Later he heard a shot. Medina ran behind a car across the street. He heard two more shots. A few seconds later he emerged from behind the car and saw defendant "doing something with the gun." Defendant then "walked away." On cross-examination Medina testified he did not belong to the Latin Kings nor did any of the others present that night. None of his friends had a gun that night.

Officer Charles Jackson testified two "live cartridges" were found in the area, 8 to 10 feet apart. He found a gun in a nearby back yard. The gun was without a cylinder.

Christina Jama testified on behalf of the defendant. At the time of the occurrence, she was defendant's girlfriend. She had known him for five months. At the time of the trial, she was the mother of defendant's child. At 11 p.m. she "was going to meet Roy [defendant] to take" her home. She met defendant and they headed through the "dark" alley. They noticed "somebody was following" them. Two males and then two more passed them, but they kept on walking. A little later the other men "started slowing down and that and that's when I heard somebody say, 'Get him,' and I told him to watch out."

Christina then "just noticed three guys on" defendant and "they were, like, holding him." She was a few feet away. She was "scared" because she "didn't know what was gonna happen." Christina then began to run for help at which time she heard two shots. She did not see defendant reach for a gun, but saw one of the other men "reaching for something." Christina ran to a place in front of "the house." She went to defendant's house and defendant arrived minutes later. They then "went upstairs to his house" and stayed there 15 minutes. She and defendant used a friend's car and drove to Mexico.

Christina also testified defendant was not a member of a gang. She said her sister, Stella, left her grandmother's porch to go home. She testified she was not aware defendant possessed a gun on that night and she had never carried that gun. She saw no other girls in the alley. Christina further said she did not tell defendant not to do it. Defendant did not say to stay away from those girls.

Investigator Daniel Darcy testified he interviewed Roldan, Bryand, Medina, and Ochoa. All told "basically the same story." They told Darcy the Jama sisters began to argue and "the two victims became involved in the argument and the defendant produced a handgun and shot both of the victims."

Defendant testified he saw Christina Jama and she asked him to walk her home. They walked through the alley toward her residence to get in the back entrance. In the alley they "heard some voices and some footsteps behind" them. They both "glanced back." Christina said there were "some guys" there.

Two men and then two more passed them. Someone yelled, " 'Get them,' " and "some guys grabbed" him. He was 3 or 4 feet away from the wall. Defendant testified, "They tried to knock me down." Defendant "just started pushing and pushing," but when he saw the guy "grabbing for something," he just pulled out his gun. He did not start to argue. He "shot them" because he "was afraid." As to the source of his fears, defendant replied, "I really don't know. I don't know if anything was going to happen to me that night or not."

Defendant did not know the men who attacked him. He had never seen them before. The neighborhood has several gangs. Defendant did not see three girls in the alley. Defendant said he carried his gun that day "because I had collected the rents that day." He later said he did not collect the rents that day and his sister had collected them and had given defendant the money. After defendant fired the gun, he "just started walking back." He took the cylinder out of the gun and threw the cylinder and gun away. Defendant walked home and told his brother what happened. He and Christina drove to Texas and Mexico. He voluntarily turned himself in to the authorities in Texas a week later.

Sophie Kuswik testified on rebuttal she was in front of the house with Christina and others. Christina is her cousin. Defendant came over to talk and then left to go to the tavern. Christina then opened her purse, and Kuswik saw a gun. Kuswik said she had first seen it earlier that day. Kuswik saw Stella by the alley. Christina and Stella had an argument in the alley. Stella went to the front of the house and then left.

When Kuswik later saw Stella, she and Christina went into the alley. Stella was with Virgie and Adelle. Stella walked through the alley with those two girls. The group of six went into the alley, and then Christina and defendant went into the alley. The six men were a half block or less behind the three girls.

When asked if defendant said anything in her presence, Kuswik said, "I guess he asked her [Christina] for the gun." Kuswik added, "She gave it to him," and "he put it in the back of his pants." Then defendant "just left" with Christina down the alley. He was a half block or less behind the six

men in the alley. Kuswik then heard the shots. Kuswik further testified the four eyewitnesses and the two victims were all Latin King members. They were all friends of Kuswik's boyfriend. She did not tell police about the gun in Christina Jama's purse at the time of the incident because she did not want to get Christina in trouble.

## I.

Defendant first contends the State failed to prove defendant guilty of voluntary manslaughter beyond a reasonable doubt because it did not prove defendant did not act in self-defense. Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 7—1) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another * * *."

Therefore, to determine whether a killing was justified under self-defense, the court must inquire "whether defendant's belief that he had to use deadly force was reasonable under the circumstances." (*People v. Smith* (1978), 58 Ill. App. 3d 784, 789, 374 N.E.2d 1285, *appeal denied* (1978), 71 Ill. 2d 613, *cert. denied* (1979, 440 U.S. 973, 59 L. Ed. 2d 790, 99 S. Ct. 1539.) "This is a question to be determined by the trier of fact and his finding will not be set aside on review unless the evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt." *Smith*, 58 Ill. App. 3d 784, 789.

■■ Self-defense is an affirmative defense. (*People v. Saunders* (1974), 18 Ill. App. 3d 117, 121, 309 N.E.2d 350; see Ill. Rev. Stat. 1979, ch. 38, par. 7—14.) Defendant must present "some evidence" of self-defense. (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(a).) Once defendant affirmatively has done so, "the State has the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." *People v. Williams* (1974), 57 Ill. 2d 239, 242, 311 N.E.2d 681, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.

In the case before us the State and defense presented conflicting versions of the incident. However, in our opinion the evidence of guilt, including evidence of the lack of self-defense, proves the defendant guilty of voluntary manslaughter beyond reasonable doubt and virtually in an overwhelming manner.

Aside from the testimony of the eyewitnesses, the evidence of defendant's flight is additional proof of his consciousness of guilt. (*People*

*v. Harris* (1972), 52 Ill. 2d 558, 561, 288 N.E.2d 385.) Here, defendant conceded he immediately dismantled his gun and threw the parts away. Also, he and Christina Jama fled to Mexico. At best we have here questions of credibility which it was the duty and function of the trier of fact to decide. *People v. Benedik* (1974), 56 Ill. 2d 306, 309-10, 307 N.E.2d 382.

■■ Defendant contends the jury totally rejected the State's case and believed defendant's claim of self-defense when it found defendant not guilty of the murder or voluntary manslaughter of Noyola and not guilty of the murder or Ruiz. This is not the law. An acquittal on some counts in a multicount indictment has no legal effect upon a simultaneous conviction. Verdicts in Illinois need not be legally or factually consistent. (*People v. Dawson* (1975), 60 Ill. 2d 278, 280-81, 326 N.E.2d 755, *cert. denied* (1975), 423 U.S. 835, 46 L. Ed. 2d 54, 96 S. Ct. 61; see also the analysis of *Dawson* in *People v. Murray* (1975), 34 Ill. App. 3d 521, 534-37, 340 N.E.2d 186.) In *Dawson*, 60 Ill. 2d 278, 281, the court stated:

> "It is true, as both Judge Hand and Mr. Justice Holmes recognized, 7 F. 2d at 60, 284 U.S. at 394, 52 S. Ct. 189, that allowing inconsistent verdicts in criminal trials runs the risk that an occasional conviction may have been the result of compromise. But the advantage of leaving the jury free to exercise its historic power of lenity has been correctly thought to outweigh that danger."

The cases relied upon by defendant do not assist him. In *People v. Harling* (1975), 29 Ill. App. 3d 1053, 331 N.E.2d 653, defendant and the victim had a fight in a tavern. The victim prevailed, but both agreed to end the encounter. They parted and defendant began to leave the tavern. At the front door, the victim hit defendant and then choked him. Defendant withdrew his pocketknife and stabbed the victim once. In that case, we pointed out that unlike the instant one, defendant's story was corroborated and not improbable because "defendant's own testimony presented strong proof of self-defense in that the force he used was justifiable and that his belief, that this conduct was necessary to save himself from imminent death or great bodily harm, was reasonable." 29 Ill. App. 3d 1053, 1060.

In *People v. Lenzi* (1976), 41 Ill. App. 3d 825, 355 N.E.2d 153, *appeal denied* (1976), 64 Ill. 2d 597, defendant, owner of a tavern, testified that several patrons who had previously created a disturbance and threatened him were again creating a disturbance. They refused to leave when requested by defendant and a police officer. One of the men attacked defendant with a broken bottle. In the ensuing scuffle, defendant wounded the man with his gun. Defendant shot another man who had taken the officer's gun and threatened defendant with it. The court noted

the State's evidence was "inconsistent and unbelievable." Defendant proved he was assisting a peace officer and also proved self-defense by "credible, convincing" evidence. *Lenzi*, 41 Ill. App. 3d 825, 834.

The strong showing of self-defense present in *Harling* and *Lenzi* is absent in the case before us. Defendant's story here was only corroborated in part by his girlfriend. Four eyewitnesses testified defendant was the aggressor. Defendant testified he shot two men because he "was afraid." However, he virtually contradicted his own evidence by his inability to specify any cause for this alleged fear. He admitted he did not know if anything would happen to him, and he could not state any cause for his fear. The verdict of guilty is strongly supported by the evidence beyond reasonable doubt.

## II.

On cross-examination, Noel Roldan testified he had discussed the case with Bryand and Ochoa on the way to court and a week before trial. Roldan also testified that when they spoke to the prosecutors they did not agree as to how the incident occurred. When defendant's attorney in cross-examination attempted to ask Roldan who had disagreed with him, the State's Attorney objected. The court sustained the objection. Then defendant's attorney asked, "What couldn't you agree upon as to what happened?" The prosecutor again objected, and the court sustained the objection.

■■■ The trial court is "vested with 'substantial discretion' to determine both the manner and scope of cross-examination." (*People v. Coles* (1979), 74 Ill. 2d 393, 395-96, 385 N.E.2d 694, quoting *People v. McCain* (1963), 29 Ill. 2d 132, 134, 193 N.E.2d 784; *People v. Williams* (1977), 66 Ill. 2d 478, 487, 363 N.E.2d 801.) The trial court's decision in this type of situation "will not be overturned absent a showing of a 'clear abuse' of that discretion 'resulting in manifest prejudice.'" (*Coles*, 74 Ill. 2d 393, 396, quoting from *People v. Halteman* (1956), 10 Ill. 2d 74, 86, 139 N.E.2d 286.) In our opinion, the refusal of the trial court to allow defendant to inquire further into any disagreement in the prior conversations was proper. Each party privy to the prior conversations was to and did testify at this trial. Although several important facts testified to were identical, there were discrepancies in the testimony of each. Human perception and emotions are such that it would necessarily be impossible for four persons to agree precisely in their testimony describing any occurrence. This is particularly true in the light of the mental and emotional stress necessarily resulting from witnessing the killing of two young men.

In addition, the questions asked called for hearsay responses. Therefore, since each declarant was present and testified in open court under oath, continued cross-examination of this type would have been

unproductive. (See *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) We find no abuse of discretion here and no manifest prejudice to defendant.

### III.

On cross-examination Bryand denied he was a member of the Latin Kings gang. The three additional prosecution eyewitnesses denied membership in the gang. Defendant asked the trial court for permission to recall Bryand for additional cross-examination as to his membership in the Latin Kings. The trial court allowed further cross-examination outside the presence of the jury.

There, Bryand testified people had called him "Jim Boy." Bryand was shown a group exhibit of several photographs of locations in the neighborhood portraying nicknames and Latin King symbols. Bryand testified the "Jim Boy" in one photograph referred to him and the "Ricky" in the same photograph referred to Ricky Ochoa. He did not know whether the "Noel" referred to Noel Roldan. In another photograph the "Jim Boy" referred to him. The trial court refused to allow further cross-examination in the presence of the jury.

■■ There is no abuse of discretion in refusing to recall a witness for further cross-examination for impeachment purposes where the principal elements of the impeaching testimony were subsequently allowed into evidence and where the witness who was not recalled was questioned as to the subject of the proposed impeachment. *People v. Powell* (1973), 53 Ill. 2d 465, 474, 292 N.E.2d 409.

■■ In the case before us, the impeaching evidence defendant wished to introduce was fully presented by the photographs in question. All of this material was received in evidence by the trial court. Thus, the defense counsel had a proper foundation for impeachment and all of the impeaching material was strongly presented by him to the jury in closing argument. Defense argument pointed out this alleged discrepancy and the photographic evidence. Any additional cross-examination of Bryand was entirely superfluous.

### IV.

Defendant finally contends the trial court abused its discretion when it refused to allow defendant to call John Herrera as an additional witness on rebuttal. The State asserts the witness should not have been called because he was not on defendant's list of possible witnesses.

In an offer of proof, defense counsel proffered that Herrera would testify he is a member of a gang called "Two-Six." He knows Bryand because of a marital relationship in their families. Bryand used to be a member of the Two-Six, but he left several years ago to join the Latin

Kings. He has seen Roldan and Ochoa wearing Latin King sweaters. He knows Bryand is a Latin King member.

Supreme Court Rule 415(g) (Ill. Rev. Stat. 1979, ch. 110A, par. 415(g)(i)) provides:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to * * * exclude such evidence * * *."

"[T]he exclusion of defense witnesses has been held to be a proper sanction where the facts and circumstances justify such action." (*People v. Braxton* (1980), 81 Ill. App. 3d 808, 815, 401 N.E.2d 1062.) "Such exclusion is within the discretion of the trial court, whose discretion will only be reviewed upon a party's showing of prejudice." *People v. Brown* (1976), 41 Ill. App. 3d 641, 649, 354 N.E.2d 602, *appeal denied* (1976), 64 Ill. 2d 597.

■■ As above shown, Bryand was cross-examined by defendant as to his alleged membership in the Latin Kings. The point was fully covered by the photographs allowed in evidence and by the final argument for the defense. The additional proposed testimony by John Herrera would have been strictly cumulative. Defense counsel specified Herrera was to be called "for the limited purpose of further impeaching Mr. Bryand as to membership in the Latin Kings." We find no abuse of discretion and no prejudice to defendant in this regard. Additionally, we see little or no materiality in the issue of gang membership here. Defendant testified definitely and without contradiction he did not know and had never previously seen any of the six men in question.

The judgment appealed from is accordingly affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.