THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN P. COONEY *et al.*, Defendants-Appellants.

Second District   Nos. 83—817, 83—886 cons.

Opinion filed September 23, 1985.—Rehearing denied November 5, 1985.

G. Joseph Weller and Manuel S. Serritos, both of State Appellate Defender's Office, of Elgin, for appellant Donald P. Loder.

Aldo E. Botti, John N. Pieper, and Peter Monahan, all of Botti, Marinaccio & Maksym, of Oak Brook, for appellant Kevin P. Cooney.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

The defendants, Donald Loder (Loder) and Kevin Cooney (Cooney), were charged in a delinquency petition with the May 15, 1981, armed robbery and murder of Zigfield Troy. The juvenile court, on motion by the State, entered an order permitting prosecution of the defendants under the criminal laws. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).) A Du Page County grand jury subsequently returned indictments charging each defendant with murder (four counts), armed robbery (one count), and armed violence (one count). Following joint pretrial proceedings, the defendants were tried separately,

Cooney being tried first and Loder being tried immediately thereafter. Following their jury trials, the defendants were found guilty of all counts. The armed violence convictions were vacated and each defendant was sentenced to concurrent terms of imprisonment of 40 years for murder and 30 years for armed robbery. Each defendant appealed and this court granted a defense motion to consolidate the two appeals.

On appeal, the defendants raise issues concerning the constitutionality of the juvenile transfer statute; the enforceability of a plea agreement; the admissibility of evidence seized and confessions obtained from the defendants; the propriety of excluding testimony of certain defense witnesses; the propriety of several evidentiary rulings made during the defendants' trials; and the propriety of the sentencing judge's conclusion as to the availability of natural life imprisonment as a possible sentence. We affirm.

In order to avoid unduly lengthening this opinion, the facts will not be recited in detail. Instead, the facts necessary to understand each issue will be noted when the particular issue is discussed.

Most of the issues raised pertain only to one or the other, but not both, of the defendants. Those issues common to both defendants concern rulings on pretrial motions to suppress which were considered at a consolidated hearing in the trial court. The suppression hearing issues will be discussed first, then Loder's other issues, and finally Cooney's other issues.

The defendants have taken somewhat different approaches to the suppression issues. Loder argues that *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, was violated by the police in obtaining his confession. Cooney argues initially that *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct.1 602, was violated in obtaining his confession, but also argues the claimed *Dunaway* violation. Each defendant also asserts his confession was involuntary. Finally, Loder argues that the police violated *Miranda* by not scrupulously honoring his expressed desire to remain silent.

It is initially necessary to discuss a contention of Cooney's concerning the propriety of the entry of his home by police officers the morning after Zigfield Troy was killed since, if Cooney's contention were correct, it would have implications concerning the admissibility of all the evidence and statements subsequently obtained. Late the night of May 15, 1981, Troy's body was found at a golf range he owned and operated. He had been stabbed 36 times and had been robbed. About 3:50 a.m. the next morning, Officers Gregory Busiedlik

and Michael Calcagno went to Cooney's house. Helen Cooney, Cooney's mother, allowed the officers to enter. Cooney claims that her consent to the entry was vitiated by deception by the police officers as to their purpose in wanting to talk to Cooney and Loder, both of whom were sleeping in the basement of the house. This contention is without basis in the record.

■ Helen Cooney, a defense witness at the suppression hearing, testified that the officers told her they wanted to talk to her son about an "incident" at the Troy Golf Range. On other occasions after they entered, the police officers also referred to what they were investigating as an "incident." On cross-examination, Helen Cooney acknowledged that, at the house, neither she nor the defendants ever asked the officers to explain what they meant by the word "incident." There was simply no deception of Helen Cooney on these facts. The officers could certainly have been more specific in their reference to the murder; however, the meaning of the word "incident" is sufficiently broad to encompass a murder. (See Webster's New Collegiate Dictionary 575 (1979).) While the officers were not entirely forthcoming about their reasons for wanting to talk to Cooney, they did not deceive Helen Cooney to gain entry to the house. Her consent, therefore, was not vitiated by police deception.

Cooney's *Miranda* issue and both defendants' *Dunaway* issues may be discussed together because of their inter-relationship. A necessary predicate to the defendants' prevailing on either of these issues is that they have been in custody at the time they were interrogated. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

> "In determining whether a statement was made in a custodial setting, a court must look to all of the circumstances surrounding the questioning, with no single factor deemed controlling, and then objectively evaluate whether a reasonable, innocent person would have believed that he was free to leave or was expressly or impliedly bound to remain in the presence of the police. [Citations.]" (*People v. Finklea* (1983), 119 Ill. App. 3d 448, 451-52, 456 N.E.2d 680, 682.)

The trial court found that the defendants were not in custody until they gave their inculpatory statements. The narrow question before this court is not whether the trial court was correct in this regard, but rather whether the finding of no custody was contrary to the manifest weight of the evidence. *People v. Clay* (1984), 124 Ill. App. 3d 140, 148, 463 N.E.2d 929, 936; *People v. Metoxen* (1983), 121 Ill.

App. 3d 472, 477, 459 N.E.2d 975, 979.

■■ There was testimony at the suppression hearing which, if believed by the trial court, was sufficient to support the trial court's finding of no custody. As noted previously, the police officers entered the Cooney home with the consent of Helen Cooney. It is undisputed— the trial court having found, the defendants both stating in their briefs, and the State not contesting in its brief—that at this time the officers did not have probable cause to arrest the defendants. Mrs. Cooney, at the officers' request, had the defendants come up from the basement where they had been sleeping. The defendants were told that the police were investigating a "problem" or an "incident" which had occurred the previous night at the Troy Golf Range. The defendants gave exculpatory statements as to their whereabouts the previous night. At the request of the officers, the boys showed the clothing which they had worn that night. Some of the items were in the basement, and the officers accompanied the boys to view them. Several items were taken by the officers to the police station with the permission of the owners of the items. After they went back upstairs, the officers asked if the boys would be willing to come to the police department, and Helen Cooney agreed they would be. Mrs. Cooney asked if she was to go with the boys and was told that would not be necessary. The boys left with the officers.

The defendants rode, unhandcuffed, in the back seat of the unmarked squad car the officers were using. On the way to the station house, one of the boys said he did not think they could be much help. Officer Calcagno, who was driving, either slowed or stopped the car and offered to return the boys home. One of the boys said that they did not mind going and would see what they could do to help the officers. At the police station, they were admitted through a buzzer-operated door. The boys were taken to separate rooms to write out their statements. The officers asked for additional details and pointed out inconsistencies. Cooney was advised of and waived his *Miranda* rights. He was questioned further until he asked to see Loder. The officers agreed to let him talk to Loder, but not alone. Loder was informed of Cooney's request and was also advised of his *Miranda* rights. The trial court apparently also believed Loder waived his rights. Although this waiver is not so clear as Cooney's, it is unnecessary to decide whether it was sufficient since the trial court's finding that the defendants were not then in custody was not manifestly erroneous. Cooney was brought into the room where Loder was and asked Loder if they should tell the police. Loder, placing his head in his hands, said to go ahead, and Cooney told the police how they had

committed the armed robbery and murder of Zigfield Troy.

The trial court was justified in concluding that the defendants voluntarily accompanied the police to the station; that the police considered, and treated, the defendants to be possible witnesses up until they inculpated themselves; and that a reasonable, innocent person would have believed himself free to leave, especially in light of the offer by the police in the car to take the defendants home. This last point is of special importance, since the conduct of the officers at the station could properly be viewed by the trial court as in no way undermining this offer, and the offer could be viewed as making it clear that the defendants could leave if they wished. Therefore, it was not manifestly erroneous for the trial court to find that the defendants were not in custody until they confessed, and, accordingly, their *Dunaway* and *Miranda* issues must fail.

■ The defendants also contend that their confessions were involuntary. The Illinois Supreme Court has stated the rules governing review of this issue as follows:

> "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence. [Citations.]" (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.)

As noted in discussing the *Dunaway* and *Miranda* issues, it was not manifestly erroneous for the trial court to conclude that the defendants were, and knew they were, free to leave the police station at any time until they made their inculpatory statements. The trial court's finding that they were not subjected to coercion or duress was also not manifestly erroneous. Moreover, there is no indication in the record that the defendants were promised anything in return for confessing.

A police officer did tell Cooney to get it off his chest and to be a man. The trial court found that this occurred after Cooney had been admonished as to his rights and that it was not coercion or duress under the circumstances. It is also noteworthy that a similar statement by a police officer to a young suspect did not render a confession involuntary in *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870. The trial court's determination that the confessions were voluntary

was therefore not manifestly erroneous.

Our holding in this regard is made with full awareness that the defendants were young (16 years old), of limited educational attainment (one a dropout and the other a poor student), and without any prior meaningful contact with the police. While these facts make the issue raised a closer one than it would otherwise be, they do not tip the scales to such an extent as to make the trial court's decision manifestly erroneous.

Loder additionally contends that the police, contrary to the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, continued to question him after he indicated that he desired to remain silent. The statements on which Loder has premised this argument were not expressions of a desire to remain silent. Instead, they were assertions by Loder that he did not know anything more than was in his written statement. Since Loder did not express a desire to remain silent, this contention is without merit. See *People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148; *People v. Aldridge* (1979), 68 Ill. App. 3d 181, 385 N.E.2d 396.

Each defendant has raised issues the other has not about aspects of the circuit court proceedings. Loder, whose separate issues will be discussed first, has raised issues concerning pretrial plea bargaining, the admission into evidence at trial of certain photographs, and the exclusion of the testimony of two defense witnesses as a sanction for a discovery violation.

■ We will first discuss Loder's issue with respect to a tentative plea agreement between the parties prior to trial. Under the agreement, the defendants would plead guilty to murder in return for sentences of 27 years' imprisonment. The agreement was disclosed to Judge Bruce Fawell who, the parties agree, conditionally concurred in the proposed disposition. The judge indicated that he would go along with what the State had agreed to as long as the defendants had no previous felony or serious misdemeanor convictions. The judge was somewhat, but not completely, familiar with the circumstances of the crime and, in response to questions from Loder's trial counsel, indicated that, despite these circumstances, he still would not "give him [the prosecutor] any problem on" the 27-year sentence agreed to. At a subsequent hearing, Judge Fawell withdrew his conditional concurrence because the plea report showed that the murder had been senseless and brutal and he thought the 27-year sentence agreed to was much too low.

Loder argues that once the trial judge conditionally concurred in the proposed disposition, he was bound by the terms of his conditional

concurrence. In the case at bar, this would mean the judge could withdraw his concurrence only on the basis of prior criminal conduct by the defendants. Since the withdrawal was premised on the circumstances of the offense, the argument goes, it was wrongful. Loder further contends that the remedy to which he is entitled is specific performance of the tentative plea agreement in accordance with the judge's conditional concurrence.

The trial judge was neither deceived nor misinformed when he conditionally concurred; indeed, defense counsel tried to bring to the judge's attention the very circumstances which later led the judge to withdraw his concurrence. The defendant never pleaded guilty nor did he rely to his detriment on the judge's conditional concurrence in the proposed disposition. The issue presented then is quite basic: Is a defendant entitled to specific performance by a judge of his conditional concurrence in a wholly executory tentative plea agreement?

Initially, it is significant that specific performance is not constitutionally required to remedy any breached plea agreement. The range of constitutionally permitted remedies for a breached plea agreement includes permitting a defendant who pleaded guilty to replead. (*Mabry v. Johnson* (1984), 467 U.S. 504, 510 n. 11, 81 L. Ed. 2d 437, 444 n.11, 104 S. Ct. 2543, 2548 n. 11; *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 427, 92 S. Ct. 495.) Loder never pleaded guilty pursuant to the plea agreement, so he was in substantially the same position as a defendant who did but was later allowed to replead. Since Loder did nothing to his detriment in reliance on the plea agreement, the constitution requires nothing more.

Thus, if Loder is entitled to specific performance of the judge's conditional concurrence, it must be as a matter of Illinois law. In this State, a judge's participation in plea bargaining is governed by Illinois Supreme Court Rule 402(d) (87 Ill. 2d R. 402(d)). That rule envisions the judge playing an extremely limited role in plea bargaining, specifically proscribing his initiation of plea discussions. (87 Ill. 2d R. 402(d)(1).) In fact, prior to the actual guilty plea hearing, Rule 402(d) only specifically approves the judge's participation when the tentative plea agreement involves the imposition of a particular sentence or the dismissal of other charges before the court. (87 Ill. 2d R. 402(d)(2).) Even in these cases, the trial judge is to play a limited part. The judge may permit the disclosure to him of the tentative plea agreement and, with the defendant's consent, may receive evidence in aggravation or mitigation. (87 Ill. 2d R. 402(d)(2).) He may then indicate to the parties whether he will concur in the proposed disposition and, if he concurs, whether his concurrence is conditional on evidence in

aggravation or mitigation subsequently received being consistent with representations made to him. 87 Ill. 2d R. 402(d)(2).

■■ If the judge concurs or conditionally concurs, he is required to so state in open court at the guilty plea hearing. (87 Ill. 2d R. 402(d)(2).)

> "If the defendant thereupon pleads guilty, but the trial judge later withdraws his concurrence or conditional concurrence, he shall so advise the parties and then call upon the defendant either to affirm or to withdraw his plea of guilty." (87 Ill. 2d R. 402(d)(2).)

The rule thus provides for a procedure to be followed in cases where the judge withdraws his concurrence to a proposed disposition. The use of the phrase "concurrence or conditional concurrence" makes it clear that the withdrawal the rule contemplates may be of an unconditional concurrence. Since an unconditional concurrence may be withdrawn under the rule, obviously the trial judge's authority to withdraw his concurrence in a proposed disposition is not limited by the terms he sets when he concurs. The rule only requires (1) that a defendant who pleaded guilty prior to the trial judge's withdrawal of his concurrence be given an opportunity to withdraw his guilty plea and (2) that, if the defendant does withdraw his guilty plea, the trial judge recuse himself. In the case at bar, Loder never pleaded guilty, so he was in substantially the same position he would have been in if he had pleaded guilty and had been permitted to withdraw his plea. Moreover, after withdrawing his concurrence, Judge Fawell recused himself. Therefore, the requirements of Supreme Court Rule 402(d), which governs the trial judge's participation in plea bargaining in Illinois, were complied with and the defendant Loder is entitled to no further relief as a result of the trial judge's withdrawal of his conditional concurrence in the proposed disposition.

*People v. Starks* (1985), 106 Ill. 2d 441, 478 N.E.2d 350, cited by Loder, is inapplicable because Supreme Court Rule 402(d), which controls the issue at bar, was not involved in *Starks*. Moreover, that case concerned a prosecutorial breach of, rather than a judicial withdrawal of concurrence in, a plea agreement. As noted previously, a judge's role in plea bargaining is very limited. A prosecutor, on the other hand, may properly participate fully in plea bargaining. Because of their significantly different roles in the process, cases setting forth rules applicable to prosecutorial breaches of plea agreements are of limited use in determining the rules applicable to judicial withdrawals of concurrences in proposed dispositions.

Loder has cited cases from two other States in support of his po-

sition that the judge's conditional concurrence should be specifically enforced. (*State v. Ashby* (1964), 43 N.J. 273, 204 A.2d 1; *People v. Flores* (1971), 6 Cal. 3d 305, 491 P.2d 406, 98 Cal. Rptr. 822; *People v. Ramos* (1972), 26 Cal. App. 3d 108, 102 Cal. Rptr. 502; *Cacilhas v. Superior Court* (1973), 35 Cal. App. 3d 233, 110 Cal. Rptr. 661.) An examination of these cases reveals that none of them involved the construction of a provision similar to Supreme Court Rule 402(d). They are therefore of no help in resolving the issue at bar which turns on the construction of Rule 402(d).

■ Loder argues that the trial court erred by admitting into evidence 21 gruesome photographs. His contention is that, in the context of this case where the contested issue at trial was Loder's sanity rather than whether he killed Zigfield Troy or the manner in which the killing occurred, the photographs were of minimal probative value and were highly prejudicial. The State argues that the photographs were not particularly gruesome and that this court has in the past upheld the admission of photographs which were more gruesome.

Photographs of a homicide victim or homicide scene, even if gruesome, are admissible if they are relevant to prove facts in issue in a case. (See, *e.g., People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208, *rev'd as to death penalty* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.) Moreover,

> "questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." (*People v. Jenko* (1951), 410 Ill. 478, 482, 102 N.E.2d 783, 785; see also *People v. Foster* (1979), 76 Ill. 2d 365, 376, 392 N.E.2d 6, 10.)

In the case at bar, the trial judge did not abuse his discretion.

It is important to recognize a crucial distinction made by the trial judge which neither Lóder nor, surprisingly, the State has noted. A review of the record reveals that the judge's ruling to admit a photograph into evidence meant that the photograph was relevant and that a proper foundation for its admission had been laid. This ruling, however, did not mean that the photograph would necessarily be presented to the jury for viewing. Between the trial prosecutor's not requesting that the jury be shown some of the photographs and the trial judge's rulings that other photographs would not go to the jury, only 10 of the 21 photographs Loder complains of were seen by the jury. These ten, and not all 21 cited by Loder, are thus the only photo-

graphs which could have had an effect on the jury.

The photographs the jury saw may be discussed in three groups. Although by no means dispositive of the issue raised, it is initially of interest to note that, for each of the three types of photographs, the more gruesome examples were not shown to the jury.

The first group of photographs shows a trail of blood which was made when the defendants dragged Mr. Troy from the parking lot of the golf range to a place near the club house. There were six of these, each photograph showing a different part of the trail or the trail from a different angle or the trial under different lighting conditions. Although it is accurate to call what is shown in the photographs a "trail of blood," that description gives a misleading impression as to the character of the pictures the jury viewed. If one knew neither what was supposed to be in the photographs nor the facts of the case at bar, it would be very difficult to identify what is depicted as blood. In short, while the facts which created the trail of blood are most certainly gruesome, the photographs shown to the jury are not.

The other two types of photograph shown to the jury are a bit gruesome. The first type, of which only one photograph was seen by the jury, shows Mr. Troy's body where it was found at the golf range. The photograph the jury saw was taken from some distance and shows the body lying on the ground from the waist up. Because of the distance and the angle, although blood is visible on the body, this was the least gruesome of the photographs of the body at the scene. The third and final type of photograph shown to the jury shows the body on the autopsy table. Three such photographs were seen by the jury. They showed the body, after it had been cleaned, from three sides without duplication. One showed the right chest, another showed the left chest and the third showed the back. Many stab wounds are clearly visible in these photographs, and there are pieces of paper with numbers on them visible in the two photographs of the chest. At this juncture, it is worth noting that the cleaning of the body made these photographs both more probative (in that it is easier to distinguish individual wounds) and less prejudicial (in that there is less blood in the photographs which are accordingly less gruesome) than photographs of the body before it was cleaned. *Cf. People v. Lefler* (1967), 38 Ill. 2d 216, 221-22, 230 N.E.2d 827, 830; *People v. Jackson* (1956), 9 Ill. 2d 484, 491 138 N.E.2d 528, 531; *People v. Landry* (1977), 54 Ill. App. 3d 159, 161-62, 368 N.E.2d 1334, 1336.

The trial judge ruled that these last four photographs would be viewed by the jury only after the parties' examination of expert witnesses on the question of Loder's sanity had, in exploring the basis of

the witnesses' opinions, touched on what the witnesses had been told about the killing of Mr. Troy. Since what the experts related was not entirely consistent with the other evidence in the case, the trial judge permitted the jury to view the four photographs of the body. The photographs were thus relevant to Loder's insanity defense by showing how the killing had occurred and by providing the jury with information it needed to determine the weight to give to the expert testimony on sanity.

From the foregoing it can be seen that the trial judge carefully determined what the jury needed to see photographs of and permitted the jury to view only so many of the photographs as were necessary. Moreover, he saw to it that, where there was a choice, the least gruesome available view depicting something was used. The trial judge's decisions with respect to which photographs to present to the jury did not constitute an abuse of discretion; they were, instead, exemplary.

Loder contends that he was denied a fair trial by a circuit court order excluding the testimony of two witnesses as a sanction for Loder's failure to list them as witnesses at the time ordered by the court. It is within the trial court's discretion to order the exclusion of the testimony of witnesses as a sanction for failing to list those witnesses pursuant to a discovery order. (87 Ill. 2d R. 415(g)(i); *People v. Aguero* (1980), 87 Ill. App. 3d 358, 367, 408 N.E.2d 1092, 1098; *People v. Brown* (1976), 41 Ill. App. 3d 641, 649, 354 N.E.2d 602, 610.) The trial court's discretion in this regard will be reviewed only upon a showing of prejudice. (*People v. Aguero* (1980), 87 Ill. App. 3d 358, 367, 408 N.E.2d 1092, 1098; *People v. Brown* (1976), 41 Ill. App. 3d 641, 649 354 N.E.2d 602, 610.) Loder has failed to make the necessary showing of prejudice.

The witnesses whose testimony was excluded were Clark Davis, a social worker who saw Loder about three years prior to the offense in 1978, and Dr. Jack Arbit, a psychologist who saw Loder about three months after the offense in 1981. Loder claims the exclusion of their testimony was prejudicial because its admission would have supported the defense theory that Loder suffered from a long-term condition rendering him insane at the time of the offense and would have rebutted the State's theory that the condition was a short-term one caused by, rather than causing, the commission of the offense.

Dr. Ralph Mesenbrink, a clinical psychologist, and Dr. Lyle Rossiter, a psychiatrist, testified in support of Loder's insanity defense. During the examination of these witnesses, the defense elicited the dates on which Clark Davis and Dr. Jack Arbit had seen Loder and

the fact that their diagnoses were essentially consistent with the diagnoses made by Drs. Mesenbrink and Rossiter. Moreover, several lay witnesses, members of Loder's family and people who had known the family, testified that Loder's personality and behavior had changed markedly after his father's death in 1976, providing additional evidence relevant to the question of whether Donald Loder's condition as diagnosed by the experts was a short- or long-term one. Under these circumstances, Loder has not shown that he was prejudiced by the exclusion of the testimony of Mr. Davis and Dr. Arbit. Therefore, this court will not review the trial court's exercise of its discretion to exclude that testimony.

■ Loder's separate issues having been resolved, Cooney's separate issues will now be reviewed. Those issues concern the validity of the statute under which Cooney was transferred from juvenile to adult criminal court, the alleged cumulative prejudicial impact of several occurrence or rulings at trial which Cooney asserts were erroneous, and the correctness of the trial court's understanding of the potential maximum sentence Cooney could receive.

The defendants were 16 years old at the time of the offense. Pursuant to the provisions of the juvenile transfer statute then in effect, a hearing was held to determine whether they should be prosecuted as adults under this State's criminal laws. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7.) At the conclusion of the transfer hearing, the court entered an order permitting prosecution of the defendants under the criminal laws. On appeal, Kevin Cooney raises an issue challenging the constitutionality of the transfer statute.

The State argues that his issue has been waived because it was not raised at trial or in Cooney's post-trial motion. However, the issue was raised in the juvenile court and the argument presented by the defendants there was virtually identical to the argument in defendant Cooney's appellate brief. Also, while the issue was not specifically raised in Cooney's post-trial motion, it was specifically raised in Loder's post-trial motion and the propriety of transferring Cooney was raised in a general way in Cooney's post-trial motion. In addition, the issue concerns the constitutionality of the statute under which the very grave decision to transfer the defendants was made. Technically, the issue has been waived by Cooney's failure to include it in his post-trial motion. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Under the circumstances of this very long and complicated case— where the issue was specifically raised at the proper time in the juvenile proceedings and in Loder's post-trial motion; and where the issue concerns the validity of the statute authorizing and governing so im-

portant a decision as the prosecution of a juvenile under the criminal laws—it is appropriate to review the merits of the issue raised as plain error. 87 Ill. 2d R. 615(a); *People v. Whitson* (1984), 127 Ill. App. 3d 999, 1001, 470 N.E.2d 1054, 1056; see also *People v. Gillman* (1980), 91 Ill. App. 3d 53, 59, 414 N.E.2d 240, 244.

Cooney's argument is that the transfer statute is unconstitutional because (1) it does not specify what burden of proof must be met in order to permit criminal prosecution of a juvenile and (2) it does not restrict the juvenile court's consideration to factors listed in the statute but additionally permits the court to consider unspecified "other matters" in arriving at its decision. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a).) Cooney's position is that these perceived deficiencies deprive both a minor and a minor's parents of due process of law at a juvenile transfer hearing.

The Illinois Supreme Court has held that the juvenile transfer statute does not deprive a minor of due process of law by failing to specify a burden of proof. (*People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) The continuing validity of *Taylor* is beyond question, since the supreme court has recently reaffirmed *Taylor* in a separate case. (*People v. Taylor* (1984), 101 Ill. 2d 377, 385, 462 N.E.2d 478, 482.) This court is therefore not at liberty to hold, as Cooney urges, that the juvenile transfer statute is unconstitutional for failing to specify a burden of proof.

Cooney's other assertion of unconstitutionality, that the statute is vague and overbroad because it permits the consideration of unspecified "other matters," was not addressed in *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366. A somewhat closer examination of the statute will therefore be necessary.

Except as provided in the transfer statute, no minor under the age of 17 at the time of an alleged offense may be prosecuted under this State's criminal laws. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(1).) If the minor is 13 years of age or more, the juvenile court may, on the State's Attorney's motion, permit criminal prosecution of the minor. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).) Such an order is permitted only if the juvenile court "finds that it is not in the best interests of the minor or of the public to proceed under" the Juvenile Court Act. (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3).) The statute goes on to guide the exercise of the discretion granted the juvenile court by providing:

> "In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (1) whether there is sufficient evidence upon

which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority. The rules of evidence shall be the same as under Section 5—1 of this Act, but no hearing on such motion may be commenced unless the minor is represented in court by counsel." (Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a).)

From the foregoing review, it may be seen that the statute is not vague and overbroad.

The statute requires a specific finding before a transfer order may be entered. It further provides guidance to the court in making this finding, specifying six factors which must be considered. The language Cooney complains of which permits the court to consider "other factors" recognizes the uniqueness of each case and allows the court to consider unspecified matters making it more or less appropriate to permit criminal prosecution. While in a sense this may be termed "vagueness," it is a vagueness necessary to provide the juvenile court the flexibility required to make sound and fair transfer decisions. With respect to Cooney's contention that the statute is overly vague and broad, it is noteworthy that Illinois' juvenile transfer statute, by providing a specific finding to be made and noting six factors to be considered in making that finding, is far more specific than the District of Columbia statute construed in *Kent v. United States* (1966), 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045. The legislature of this State followed the guidelines provided in *Kent* in drafting the juvenile transfer statute, reinforcing the presumptions of constitutionality attaching to the statute. (*People v. Taylor* (1979), 76 Ill. 2d 289, 299-300, 391 N.E.2d 366, 370-71.) This in turn bolsters the conclusion that, in the context of the Illinois juvenile transfer statute, it is not unconstitutionally vague and overbroad to permit the court to consider "other matters" not specified in the statute.

Finally, Cooney in his brief analogized the juvenile transfer proceedings at bar to certain other types of proceedings. Perhaps the closest and most heavily relied upon analogy was to a New York statute authorizing preventive pretrial detention of juveniles which had been held to be violative of due process by a Federal district court.

Events have overtaken Cooney, in that his argument in this regard has been undermined by a United States Supreme Court opinion upholding the validity of the New York statute and reversing both the district and Federal appellate court judgments to the contrary. (*Schall v. Martin* (1984), 467 U.S. 253, 81 L. Ed. 2d 207, 104 S. Ct. 2403.) Particularly damaging to Cooney's position are the court's remarks about the need to respect the flexibility and informality of juvenile proceedings while insuring their fundamental fairness and about the inapplicability of an overbreadth attack on the pretrial detention statute. (*Schall v. Martin* (1984), 467 U.S. 253, 268-69 n.18, 81 L. Ed. 2d 207, 219-20, 220 n.18, 104 S. Ct. 2403, 2412 n.18.) Therefore, to whatever extent our juvenile transfer statute's permitting the consideration of unspecified matters may be analogous to the provisions of New York's juvenile pretrial detention statute, that analogy further bolsters, rather than undermines, the conclusion that the juvenile transfer statute comports with due process.

■■■ Cooney has argued that several errors occurred during the course of his trial. Further, he asserts that the errors had a cumulative effect sufficiently prejudicial to deprive him of a fair trial. We disagree.

Cooney argues that the admission into evidence of three gruesome photographs was prejudicial error. The three photographs were the three views of the deceased on the autopsy table after cleaning which were shown to Loder's jury and have previously been described. Cooney's jury was also shown these photographs.

The applicable law was discussed in deciding Loder's similar issue, so it need not be reviewed again. The defense was insanity, and the photographs, bearing as they did on the way in which Zigfield Troy was killed, were relevant to whether the mental state of Troy's killers was that necessary to convict of murder and whether Troy's killer were sane at the time of the offense. As at Loder's trial, many photographs were admitted into evidence but not shown to the jury, some because the prosecutor did not request that they be shown and others because the trial court exercised its discretion to keep them from the jury. In a case involving photographs like those at issue here, "[t]he major bulwark against prejudicing the jury is the sound discretion of the trial judge." (*People v. Foster* (1979), 76 Ill. 2d 365, 378, 392 N.E.2d 6, 11.) In the case at bar, the admission of the three photographs at issue was not an abuse of discretion.

Cooney's next claim is that prejudicial error occurred when "[t]he prosecutor and the victim's wife parad[ed] hand-in-hand before the jury to the witness stand." The quoted material, brief and unenlight-

ening as it is, constitutes the entirety of Cooney's "argument" on this point. There are two components to the claim: (1) the occurrence was trial court error and (2) Cooney was prejudiced by it. While Cooney has cited to the point in the record where the event complained of occurred, he has supported neither of the components of his claim with reasoning or with citation of any authority. This claim, therefore, fails to comply with Supreme Court Rule 341(e)(7) and will not be addressed. 87 Ill. 2d Rules 341(e)(7) and 612(i); *People v. Ramirez* (1983), 98 Ill. 2d 439, 472, 457 N.E.2d 31, 47.

Cooney argues that he was prejudiced by the erroneous introduction into evidence of testimony by Officer Michael Calcagno that a knife found in Cooney's room, which was not shown to be connected to the offense, had been sharpened by Cooney prior to the date of the offense. This assertion of error is puzzling since the record reference in Cooney's brief is to a page of Cooney's own testimony on a different subject and since, as the State correctly notes, a reading of Officer Calcagno's trial testimony reveals no reference to Cooney's having sharpened the knife. The issue raised is thus without merit.

■■ Cooney argues that the trial court erred by allowing Joseph Amendala to testify because no foundation was laid for his testimony and because it was hearsay. Amendala had been present at the golf course the evening Mr. Troy was killed. He had seen Mr. Troy with two men, whom he was unable to identify, and had heard Mr. Troy "holler" at the men. When it became apparent that the State could not sufficiently connect Amendala's testimony to Cooney, the trial court ordered the testimony stricken and instructed the jury to disregard it. In the case at bar, this action by the trial court was sufficient to cure the prejudice, if any, of Amendala's testimony. *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200, 1205-06.

■■ Cooney further asserts that error occurred when he was impeached with parts of a statement (which had been suppressed for reasons other than involuntariness) without a prior trial court determination that the statement had been voluntarily made. The State responds that this issue has been waived because the record does not show the grounds upon which Cooney's contemporaneous objections were made.

The State's argument calling into question the reviewability of the issue raised will be discussed first. Immediately prior to the objected-to impeachment, two defense-requested side-bar conferences were held out of the hearing of the court reporter; during the impeachment, defense counsel twice made the "same objection" and the court twice made the "same ruling"; and after being found guilty, Cooney

filed a post-trial motion specifically noting the alleged error. In a very similar case, our Supreme Court held that where an alleged error was specifically stated in a post-trial motion and may have been specifically asserted at an unrecorded side-bar conference, the failure of the record to reflect the specific ground of a contemporaneous objection did not result in a waiver of the alleged error. (*People v. Stover* (1982), 89 Ill. 2d 189, 193-94, 432 N.E.2d 262, 264.) Accordingly, the issue at bar was not waived and will be reviewed.

■■■ The admissibility of the statement used to impeach Cooney was fully litigated prior to trial in a hearing before Judge Edward Kowal. Following the hearing, Judge Kowal entered a detailed order in which he specifically found that the objected-to statement had been made voluntarily but suppressed it on other grounds. This fact, inexplicably missing from the State's argument, disposes of the issue raised. Cooney's statement was found to have been voluntary by Judge Kowal after a full hearing and, while that decision was not final until final judgment, Cooney nonetheless was deprived of no constitutional rights when Judge Harry Strouse, before whom the case was tried, declined to hold another hearing on the question. *People v. Gonzales* (1968), 40 Ill. 2d 233, 240, 239 N.E.2d 783, 788.

■■■ Cooney also argues that five lay witnesses for the State were improperly permitted to testify that Cooney was, in their opinions, sane because the State failed to lay a proper foundation for the admission of that testimony. It has long been held that:

> "a nonexpert witness who had had an opportunity to observe the subject under inquiry may give his opinion as to his mental condition—at the same time stating the facts and circumstances as the basis for the opinion." (*People v. Pruszewski* (1953), 414 Ill. 409, 413, 111 N.E.2d 313, 315; accord, *People v. Patlak* (1936), 363 Ill. 40, 1 N.E.2d 228; and *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319.)

Whether the witness has testified to sufficient facts and circumstances is a matter within the trial court's discretion, and the trial court's decision in this regard will not be reversed unless it is shown that the court abused its discretion. (*People v. Kuntz* (1977), 52 Ill. App. 3d 804, 368 N.E.2d 114.) Each of the five witnesses Cooney complains of testified to (1) the fact and extent of his opportunity to observe Cooney near the time of the offense, (2) his opinion that Cooney was sane, and (3) the reasons (*i.e.*, the facts and circumstances) underlying his opinion which included, depending on the witness, such things as his acquaintance with Cooney over a period of time, his experience in dealing with persons with mental problems in

the past, and the specifics of Cooney's behavior at the time of observation. There was no abuse of discretion in the trial court concluding that the testimony at issue was admissible.

■■■ Cooney next complains of two jury instructions. First, he asserts error in instructing the jury on accountability when the indictment did not charge an accountability theory. This was not error, since the rule in Illinois has long been that one charged only as a principal may be convicted as an accessory. (See, *e.g.*, *Spies v. People* (1887), 122 Ill. 1, 12 N.E. 865; *People v. Krouse* (1975), 30 Ill. App. 3d 446, 333 N.E.2d 17.) Second, he complains that the jury was instructed on the special verdict of guilty but mentally ill when there was no evidence of mental impairment. The verdicts returned by the jury were "guilty," and Cooney has not explained how, under these circumstances, erroneously instructing the jury on the special verdict of "guilty but mentally ill" could be anything but harmless. Moreover, in support of his insanity defense, Cooney himself introduced evidence of mental impairment. While the applicable statute apparently contemplates cases in which a jury should be instructed on the special verdict of insanity but not on the special verdict of guilty but mentally ill (Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j)), the case at bar does not appear to be such a case, and Cooney has argued only that instructing the jury on the special verdict of guilty but mentally ill was improper due to a total lack of evidence of mental impairment. Therefore, the instructions complained of were properly given.

The trial court rulings Cooney argues were prejudicially erroneous were thus waived, proper, or wholly nonprejudicial. This being the case, there is no need to determine whether they had a cumulatively prejudicial impact sufficient to deprive Cooney of a fair trial. There being no reversible error in the pretrial or trial proceedings, the final subject to be addressed is a sentencing issue raised by Cooney.

The defendants were sentenced to maximum nonextended terms of 40 years imprisonment for murder. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(a).) Cooney asserts that the trial judge's sentencing decision may have been influenced by an erroneous belief that natural life imprisonment was a possible sentence. This will be discussed as a sentencing issue, even though Cooney makes the contention as part of his argument that the cumulative effect of trial errors requires reversal, because the error asserted could only have affected sentencing and not the trial itself.

In arguing that natural life imprisonment was not a possible sentence, Cooney focuses on the provisions of the Unified Code of Corrections dealing with extended terms of imprisonment. (Ill. Rev. Stat.

1981, ch. 38, pars. 1005—5—3.2(b), 1005—8—2.) An extended term may not be imposed unless one of the aggravating factors listed in Section 1005—5—3.2(b) is found to be present. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a).) The provision upon which Cooney relies states:

> "(b) [T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:
>
> * * *
>
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; * * *."

(Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(2).) As Cooney correctly notes, because the defendants were 16 years old at the time of the offense, this section precluded the imposition of an extended-term sentence in the case at bar.

Cooney, however, would read the quoted provision as a broad restriction on the use of the wanton cruelty aggravating factor making it impermissible to consider it in any context when a defendant was less than 17 years old at the time of an offense. For this reason, Cooney argues, the trial judge in the case at bar was incorrect in believing natural life imprisonment was a possible sentence in this case. The flaw in Cooney's argument is that the imposition of a sentence of natural life is controlled by a wholly distinct statutory provision. That provision provides:

> "(a) A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:
>
> (1) for murder, * * * (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty * * *, the court may sentence the defendant to a term of natural life imprisonment * * *." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(b).)

As can be seen, unlike the extended-term provision, this statute contains no age limitation. Where the legislature has decided to limit the imposition of a particular sentence to offenders above a certain age, it has done so by express language to that effect. (See Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b) (defendant must have been 18 or more at time of offense to impose death sentence) and 1005—5—3.2(b) (defendant must have been at least 17 at the time of offense to impose extended-term sentence).) The lack of language limiting the imposition

of a natural life sentence to offenders of a certain age indicates that the provision is generally applicable to defendants of any age who are convicted of murder.

Cooney asserts that:

"Applying the same factor of exceptionally brutal or heinous conduct to one 16 year old to enhance the period of incarceration, but not applying the same factor to another, raises legitimate concerns as to the validity of the statutes."

██ Since Cooney never explains what these concerns might be, no extended discussion of this contention is necessary. Suffice it to say that (1) similarly situated 16 year olds, those convicted of wantonly cruel murders, are treated similarly in that natural life is a possible sentence for all of them and (2) the statute at issue has been upheld in the face of a specific attack on its constitutionality. (*People v. Hudson* (1981), 95 Ill. App. 3d 350, 420 N.E.2d 271.) The trial judge therefore did not err in considering natural life as a possible sentence.

The judgments of the circuit court of Du Page County, accordingly, are affirmed.

Affirmed.

HOPF and SCHNAKE, JJ., concur.